**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GREGORY GERARD GREER,

*Plaintiff,*

v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION, *et al.*,

*Defendants.*

Civil Action No. 24-948 (SLS)

Judge Sparkle L. Sooknanan

### MEMORANDUM OPINION

In late 2017, Viva USA Inc. hired Gregory Greer to provide technical writing services for the International Business Machines Corporation (IBM). At Mr. Greer's request, Viva contracted for his services through his personal S-Corporation, American Copytaster, Inc. (ACI). Mr. Greer served on IBM's team for three and a half years. During that time, he submitted timesheets reflecting no more than 40 hours of work in any given week. Through ACI, he submitted invoices for those timesheets to Viva, and Viva paid ACI in full each time. Mr. Greer maintains, however, that his timesheets did not reflect his overtime. He alleges that he frequently worked more than 40 hours a week, that his supervisors gave him assignments that they knew would require after-hours work, and that they forbade him from billing for overtime. After his termination in July 2021, Mr. Greer submitted an invoice for 1,000 hours of unpaid overtime.

When Viva refused to pay Mr. Greer, he sued IBM and Viva under the Fair Labor Standards Act (FLSA) and District of Columbia wage laws to recover his unpaid wages. IBM and Viva then filed a third-party complaint against ACI, claiming that ACI was Mr. Greer's employer and thus responsible for any underpayment to Mr. Greer. They also claim that if Mr. Greer was underpaid, ACI breached its contract with Viva and is obligated by that contract and by D.C. wage

laws to indemnify IBM and Viva for any money owed to Mr. Greer. IBM and Viva now move for summary judgment on Mr. Greer's claims and their third-party claims against ACI. Mr. Greer moves to exclude an expert noticed by IBM and Viva. And Mr. Greer and ACI move to realign ACI as a plaintiff, asserting that they have identical interests in this litigation. For the reasons that follow, the Court denies IBM and Viva's motion for summary judgment, and it denies without prejudice Mr. Greer and ACI's motion for realignment and Mr. Greer's motion to exclude.

## BACKGROUND

### A.      Factual Background

The Court draws the facts from the Parties' Statements of Material Facts and the underlying materials referenced in those statements. *See* Defs.' Statement of Undisputed Facts (DSOF), ECF No. 20-2; Pl.'s Statement of Disputed Material Facts (PSOF), ECF No. 25-1; Defs.' Resp. to PSOF, ECF No. 27-1. The Court assumes the facts in those statements to be true unless they have been specifically disputed, and it assumes the truth of other undisputed statements in the record. *See* Fed. R. Civ. P. 56(e)(2); *see also* LCvR 7(h)(1).[1]

Mr. Greer is a writer and editor with more than 25 years of experience working on federal government contracts. Second Am. Compl. (SAC) ¶ 8, ECF No. 1-1 at 4–16. He is the sole owner and operator of ACI, an S-Corporation that he created in 2004. DSOF ¶ 3; ECF No. 20-5 at 11–12.[2] IBM is a corporation that "integrates technology and expertise, providing infrastructure, software, and consulting services for private and government clients." DSOF ¶ 1. Viva is a corporation

---

[1] Local Rule 7(h) provides that "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

[2] The Parties' filings include many exhibits with varying titles and pagination. For clarity, the Court cites the document and page numbers assigned by the Electronic Case Filing (ECF) system unless otherwise indicated.

"specializing in a broad range of IT consulting and staffing solutions across the United States for corporate and government clients." DSOF ¶ 2.

In November 2017, Viva contacted Mr. Greer about hiring him to provide technical writing services to IBM as part of a contract that IBM had with the Environmental Protection Agency (EPA). DSOF ¶¶ 6–7. Viva sought to employ Mr. Greer as a standard "W-2 employee." DSOF ¶ 6. But Mr. Greer instead asked Viva to set up a corporation-to-corporation agreement between Viva and ACI. *Id.* Mr. Greer did not know at the time how long the opportunity would last and he had found, based on "prior experience," that "working W-2 jobs for short terms" created logistical challenges. ECF No. 20-5 at 27–28. To him, the corporation-to-corporation arrangement was thus a "preferable employment relationship" for "seemingly temporary jobs." *Id.*

Viva agreed, and later that month, Viva and ACI executed a "Subcontractor Agreement." DSOF ¶ 6; *see* ECF No. 25-11. The Agreement obligated ACI to provide "IT consulting and programming services" to Viva's client—IBM—through a consultant. ECF No. 25-11 at 2. ACI agreed that it would provide the required services "diligently" and warranted that "all the work performed" by its consultant would be "compliant with" the client's "requirements." *Id.* at 3–4.

The Agreement provided that ACI would be paid "for each approved hour worked" including for "each overtime hour, approved in advance as billable to the" client. *Id.* at 2. ACI agreed that it would "submit invoices for payment . . . at the end of every billing period" that specified the "number of hours of Services" rendered by its consultant to the client that were "substantiated" by "time sheets" approved by the client. *Id.* ACI also agreed that it was an independent subcontractor, that neither it nor its consultant was "serving as an employee" of Viva or the client, and that it would "maintain and pay for all applicable federal, state and local disability, worker's compensation, payroll taxes, self-employment insurance and income and other taxes" for itself and its consultant. *Id.* at 4–5.

3

If either party or its personnel breached the Subcontractor Agreement, the other party would be entitled to recover "damages and injunctive relief" and any expenses incurred in "seeking such relief." *Id.* at 6. The Agreement also included an indemnity clause providing that ACI would "indemnif[y] and hold[] harmless" Viva and IBM against all "claims, liabilities, losses, expenses . . . , fines, penalties, taxes, or damages . . . asserted by any third Party" arising out of a claim that any consultant "is not an employee or contractor of [ACI]." *Id.* at 5.

The Agreement set an initial term of one year with the option to extend depending on IBM's needs. *Id.* at 2; DSOF ¶ 16. Either party could terminate the Agreement by providing 30 days written notice. ECF No. 25-11 at 4.

With the Agreement signed, Mr. Greer began work in December 2017. DSOF ¶ 8; SAC ¶ 15. He worked continuously as a "Technical Writer" on IBM's contract with the EPA until his termination on July 29, 2021. DSOF ¶ 8; SAC ¶ 15. When Mr. Greer started, IBM's Program Manager on the EPA contract was Felicia Lipe-Dobson. SAC ¶ 15. In September 2019, Hugh Livengood succeeded Ms. Lipe-Dobson. *See* ECF No. 20-3 ¶ 4. Mr. Livengood remained the Program Manager for the EPA contract through Mr. Greer's termination. *See id.*

Viva incrementally increased the rate that it paid ACI for Mr. Greer's services over the roughly three and a half years that he worked on the EPA contract. DSOF ¶¶ 18–21. The rate started at $46.30 per hour, and Viva raised it by approximately one dollar each year, so that by November 2020, Viva was paying ACI $49.00 per hour. *Id*. Generally, the invoicing process proceeded as contemplated in the Agreement. Each week, Mr. Greer reported his hours using IBM's electronic timesheet system; the IBM Program Manager authorized the timesheet; Mr. Greer (acting on behalf of ACI) invoiced Viva for the hours he had worked; and Viva paid the invoice by sending funds to ACI's corporate bank account. DSOF ¶¶ 32–36. Mr. Greer, again acting as ACI, would then transfer a portion of those funds to himself. DSOF ¶ 37; *see* PSOF ¶ 9.

4

During 2018, 2019, and 2020, ACI submitted invoices totaling $88,149.90, $82,561.90, and $89,804.00, reflecting annual hour totals of 1,900 hours, 1,751 hours, and 1,865 hours. DSOF ¶¶ 51, 54, 58. Viva paid ACI for these invoiced amounts. DSOF ¶ 47; *see* PSOF ¶ 14. None of the invoices submitted by ACI reflected overtime. DSOF ¶¶ 41–44; SAC ¶ 19; ECF No. 25-5 ¶ 9.

The same pattern held true at the start of 2021. Until his termination in July of that year, Mr. Greer (acting as ACI) submitted invoices to Viva totaling $56,056.00 for 1,144 hours worked. DSOF ¶ 62. Viva paid those invoices. DSOF ¶ 47; *see* PSOF ¶ 14. Shortly after his termination, however, in August 2021, Mr. Greer submitted an invoice for $49,000 for 1,000 hours of "off-the-clock" work that he claimed IBM had "made [him] do" over the previous three and a half years. ECF No. 20-5 at 644–45; DSOF ¶ 82; ECF No. 25-5 ¶ 9. Viva did not pay that invoice.

## B.    Procedural Background

In June 2022, Mr. Greer filed this lawsuit against Viva and IBM in the Superior Court of the District of Columbia alleging breach of contract and violations of the D.C. Minimum Wage Revision Act (DCMWRA), D.C. Code § 32-1001 *et seq*. Notice of Removal at 2, ECF No. 1. In October 2022, IBM and Viva filed a Third-Party Complaint against ACI advancing claims for breach of contract, contractual indemnification, and statutory indemnification under the DCMWRA and the D.C. Wage Payment and Collection Law (DCWPCL), D.C. Code § 32-1301 *et seq*. Third-Party Compl. ¶¶ 44–75, ECF No. 1-1 at 23–27. The Parties then engaged in extensive litigation that resulted in Mr. Greer filing the operative Second Amended Complaint in March 2024. Notice of Removal at 2. The Second Amended Complaint advances three claims for failure to pay overtime under the DCMWRA, the DCWPCL, and the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, as well as a fourth claim for failure to pay minimum wages under all three statutes. SAC ¶¶ 24–38.

On April 2, 2024, the Defendants removed the case to this Court. After discovery, IBM and Viva moved for summary judgment on Mr. Greer's claims and on their third-party claims against ACI. Mot. Summ. J., ECF No. 20. Mr. Greer moved to exclude the report and testimony of the Defendants' expert, David Sun. Mot. Exclude, ECF No. 19. And Mr. Greer and ACI moved to realign ACI's position from Third-Party Defendant to Plaintiff. Mot. Realign, ECF No. 24. All three motions are ripe for review. *See* Opp'n Mot. Summ. J., ECF No. 25; Reply Mot. Summ. J., ECF No. 27; Opp'n Mot. Exclude, ECF No. 21; Reply Mot. Exclude, ECF No. 22; Opp'n Mot. Realign, ECF No. 26; Reply Mot. Realign, ECF No. 28.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing "the absence of a genuine dispute of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). To defeat summary judgment, the nonmovant must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (cleaned up). In considering a motion for summary judgment, a court "may not make credibility determinations or otherwise weigh the evidence." *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016). Instead, it must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* Summary judgment is appropriate only if, viewing the evidence in that light, the court concludes that no reasonable jury could find for the nonmovant. *Steele v. Mattis*, 899 F.3d 943, 947 (D.C. Cir. 2018).

## DISCUSSION

The Court first addresses IBM and Viva's arguments for summary judgment on Mr. Greer's claims and on their own claims against ACI. It then turns to Mr. Greer and ACI's motion for realignment. And finally, it discusses Mr. Greer's motion to exclude. Ultimately, the

Court concludes that summary judgment is not warranted, that realignment is inappropriate, and that it is unnecessary to exclude the Defendants' expert at this stage in the litigation.

### A.    Mr. Greer's Claims Against IBM and Viva

IBM and Viva offer three reasons in support of summary judgment on Mr. Greer's claims. They contend: (1) that Mr. Greer has not adduced sufficient evidence to establish a prima facie case for unpaid wages under the DCMWRA, DCWPCL, or FLSA; (2) that Mr. Greer cannot prove damages against them because he had no set hourly wage and Viva paid ACI enough money to compensate him at the statutorily prescribed rates for the hours that he claims to have worked; and (3) that Mr. Greer is barred from recovery by the unclean hands doctrine because he failed to report (or have ACI invoice) any overtime hours. While IBM and Viva may well convince a jury that they are correct, their arguments do not carry the day at summary judgment.

### 1.    Prima Facie Case

The FLSA, DCMWRA, and DCWPCL require that employers pay qualifying employees at least a minimum wage for the first 40 hours worked in a workweek, and an overtime rate of at least one-and-a-half times the employees' regular hourly rate for all weekly hours beyond 40. *See* 29 U.S.C. §§ 206–07 (FLSA); D.C. Code § 32–1003(b)–(c) (DCMWRA); D.C. Code §§ 32-1302–03, 1308 (DCWPCL); *see also Kang Kyu Seo v. Oh*, 573 F. Supp. 3d 277, 280–82 (D.D.C. 2021) (providing an overview of how the FLSA and D.C. wage laws interact, including how the DCMWRA "sets the minimum wages and overtime premiums under D.C. law" and the DCWPCL establishes requirements for how they must be paid). Courts generally apply the same legal standards in assessing the viability of unpaid wage claims under all three statutes. *See Eckington House Mental Health Servs., LLC v. Off. of Wage-Hour*, 346 A.3d 683, 688–89 (D.C. 2025) (collecting cases from the D.C. Court of Appeals, the D.C. Circuit, and D.C. district courts

observing that claims for uncompensated work under the D.C. wage laws and the FLSA are generally subject to the same legal standards).

To prevail on his claims under these statutes, Mr. Greer must prove that he was employed by the Defendants and that he did work for them for which he was inadequately compensated. *See Koné v. Staples, Inc.,* No. 24-cv-2420, 2025 WL 2097737, at *5 (D.D.C. July 25, 2025); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946) (holding that an employee who brings suit under the FLSA "for unpaid minimum wages or unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated"). The Defendants argue that Mr. Greer has not adduced sufficient evidence from which a reasonable jury could conclude: (1) that IBM and Viva were his employers; (2) that he worked any hours beyond those reported on his timesheets; and (3) that if he did work such hours, that IBM and Viva knew or should have known about those hours and compensated him for them. The Court addresses these arguments in turn.

### a. Employer-Employee Relationship

The FLSA defines the word "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). This definition is "extremely broad in its reach," *Mills v. Anadolu Agency NA, Inc.*, 105 F.4th 388, 394 (D.C. Cir. 2024), "in accordance with the remedial purpose" of the statute, *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 10 (D.C. Cir. 2001) (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988)). "The Supreme Court has interpreted the FLSA's 'suffer or permit to work' language to require courts to examine the 'economic reality' of an employment relationship rather than rest on 'technical concepts' such as the labels the parties attach to their relationship." *Mills*, 105 F.4th at 394 (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). Courts may thus "find an employment relationship even if the parties did not intend to create one." *Id.* And "[t]hat same approach applies to employment relationships under [D.C.

8

wage laws].” *Id.* at 394, 397–98 (citing *Wright v. Off. of Wage Hour*, 301 A.3d 660, 678 (D.C. 2023)); *see also Thompson v. Linda And A., Inc.*, 779 F. Supp. 2d 139, 146 (D.D.C. 2011) (“[D]eterminations of employer or employee status under the FLSA apply equally under the District of Columbia wage laws.”).

To determine an individual’s employment status under the “economic reality” test, courts consider various factors including: the degree of control exercised by the putative employer over the worker, the worker’s opportunity for profit or loss and their investment in the business, the degree of skill and independent initiative required to perform the work, the permanence or duration of the working relationship, and the extent to which the work is integral to the employer’s business. *See Morrison,* 253 F.3d at 11; *see also Steinke v. P5 Sols., Inc.*, 282 A.3d 1076, 1084–85 (D.C. 2022). No one factor is dispositive, and ultimate resolution of the inquiry hinges on whether, in analyzing the totality of the circumstances, the worker is “so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit.” *Thompson*, 779 F. Supp. 2d at 147 (quoting *Morrison*, 253 F.3d at 11). Applying the economic-reality test to “distinguish[] employment from independent contracting” or to “identify[] a joint-employment relationship” is a “fact-intensive inquir[y].” *Mills*, 105 F. 4th at 399–400. And while the employment status question under the FLSA is a legal one, “any subsidiary factual issues” that must be resolved to answer that question are generally “questions of fact for the jury.” *Morrison*, 253 F.3d at 10 n.3 (cleaned up).

The D.C. Circuit’s decision in *Morrison*—its leading case on the subject—is illustrative. The district court in *Morrison* granted judgment as a matter of law for the defendant at trial after finding that the plaintiff, who had worked as a consultant for the defendant, was not an employee. *Id.* at 10. The district court emphasized, among other things, that the plaintiff “submitted her invoices on her own letterhead,” that she “believed that she was an independent contractor,” that

the defendant "filed 1099 tax forms [for her], rather than W-2 tax forms," and that "she received only minimal direction from" her supervisor. *Id.* The Circuit reversed, holding that when viewed in the light most favorable to the plaintiff, the facts supported that the defendant "had the power to hire and fire" her, that it exercised supervisory authority and a "considerable degree of control" over "her work schedules [and] conditions of employment," and that she "had little opportunity for profit or loss and made no investment in the business." *Id.* at 11 (cleaned up). Under those circumstances, the "facile labels" describing the relationship and even the plaintiff's "self description" as an independent contractor did not necessarily "reflect economic reality." *Id.* (cleaned up).[3]

Here, the factual record resembles *Morrison* in several respects. At the most superficial level, the Subcontractor Agreement between ACI and Viva creates a corporate relationship that appears to put some distance between the Defendants and Mr. Greer. *See generally* ECF No. 25-11. After all, the only place where Mr. Greer's name appears in the contract is where he signed it on behalf of ACI. *See id.* at 6. And this was by design. Mr. Greer requested to work under a corporation-to-corporation arrangement instead of a more traditional W2 relationship. DSOF ¶ 6. But whatever Mr. Greer's intentions may have been, there is record evidence suggesting that the "technical concepts" and the "labels the parties attach[ed] to their relationship" in the contract did not reflect the "economic reality" of Mr. Greer's employment relationship with the Defendants. *Mills*, 105 F.4th at 394 (quoting *Goldberg*, 366 U.S. at 33).

Mr. Greer attests, for example, that IBM and its Program Managers on the EPA contract, including Mr. Livengood, "supervised and controlled [his] employment and work conditions and

---

[3] *Morrison* applied the economic reality test to distinguish employment from independent contracting. Both sides apply that test here even though this case involves a corporation-to-corporation relationship. And they do so without analyzing whether the corporate veil may be pierced in this scenario. The Court follows their lead without weighing in on that question.

performance on a daily basis." ECF No. 25-5 ¶ 6. He says that he "operated as a member of the IBM team . . . without separate identity or discretion to work independently." *Id.* More specifically, he claims that the IBM Program Managers "dictated" everything that he did from his daily and weekly assignments to the way that he completed them, with Mr. Livengood critiquing "every last detail of . . . what [he] was ordered to do." ECF No. 20-6 at 82, 86 (Greer Deposition testimony). Mr. Greer also points to a "diary" that he attached to a complaint that he filed with the EPA Office of the Inspector General that details numerous specific incidents of Mr. Livengood's alleged micromanagement. *See* ECF No. 25-9 at 10–36.

Mr. Greer further attests that the Defendants dictated his work hours and thus his pay. ECF No. 25-5 ¶ 8. They restricted him to a "maximum 40-hour paid workweek" but gave him assignments that they knew would require him to work beyond 40 hours in a week. *Id.* They also made clear that overtime payment was not an option and would never be approved. ECF No. 20-6 at 82 (Mr. Greer describing his understanding of the overtime policy as "keep your mouth shut" and saying that he "wouldn't dare" to ask Mr. Livengood to approve overtime); ECF No. 20-5 at 154 (Mr. Greer recounting that when he told Viva's representative that he was "working 80 hours a week," the representative responded, "If you want the job, just do it"); ECF No. 25-5 ¶ 8 (Mr. Greer attesting that Viva's representative made clear that he should "keep [his] mouth shut" about overtime pay if he wanted to keep his job).

In addition to controlling Mr. Greer's daily assignments, hours, and pay, evidence in the record supports that the Defendants had the power to hire and fire Mr. Greer. *See Morrison*, 253 F.3d at 11. Mr. Greer states that it was Mr. Livengood who instructed him to report to the EPA in July 2021 and "to turn in [his] EPA-issued laptop and EPA identity card." ECF No. 25-5 ¶ 7. And it was Mr. Livengood who told him that he was fired. *Id*.

Viewing this evidence in the light most favorable to Mr. Greer, the Court cannot conclude as a matter of law that he was not the Defendants' employee. *Morrison*, 253 F.3d at 11–12. The Defendants rely primarily on *Steinke v. P5 Solutions, Inc.*, in arguing otherwise. Mem. Supp. Mot. Summ. J. (Mem. Summ. J.) 11, ECF No. 20-1. There, the D.C. Court of Appeals affirmed a summary judgment ruling that the plaintiff was not the defendant's "employee" under the economic reality test. *Steinke*, 282 A.3d at 1088. The Defendants describe *Steinke* as "similar." Mem. Summ. J. 11. They point out that the plaintiff "specifically negotiated a contractor relationship, despite [the defendant] initially requesting to hire him as an employee, in order to maintain more control over his schedule and tasks." *Id.* True, but that is where the similarities end. Unlike Mr. Greer, the plaintiff in *Steinke* was hired by the defendant to "run" an entire "line of the business." 282 A.3d at 1085–86. As a result, there was "considerable evidence that [he] exercised control over the manner in which he performed his work" and that he "had responsibility for defining how" the line of business would be run. *Id.* (cleaned up). He "generally determined how many hours he would work each day." *Id.* at 1086. And the defendant did not "appear[] to direct the manner in which [he] was to accomplish" his various tasks. *Id.* The agreement between the plaintiff and the defendant also included an "incentive compensation agreement," which tied the plaintiff's pay to his successful performance and gave him a meaningful opportunity to share in the defendant's profits. *Id.* Given these differences, the Court is unpersuaded that *Steinke* supports the Defendants' position.

In sum, a reasonable jury presented with the record evidence could find that the "labels" and "technical concepts" in the Subcontractor Agreement do not reflect the "economic reality" of Mr. Greer's employment status and instead conclude that IBM and Viva were Mr. Greer's employers. *Mills*, 105 F.4th at 394 (quoting *Goldberg*, 366 U.S. at 33). Of course, a reasonable jury could agree with the Defendants. But much will depend on how it assesses Mr. Greer's

12

credibility. And the mere fact that Mr. Greer's case hinges largely on his own testimony and credibility does not preclude his claims from surviving summary judgment. *Murphy v. D.C.*, 590 F. Supp. 3d 175, 186 (D.D.C. 2022) (noting that "[t]he D.C. Circuit has repeatedly advised district courts that a 'party's own sworn testimony can alone defeat summary judgment'" (quoting *United States v. $17,900 in U.S. Currency*, 859 F.3d 1085, 1092 (D.C. Cir. 2017), and collecting cases).

### b. Evidence of Unreported Work Hours

An employee suing for unpaid compensation "has the burden of proving that he performed work for which he was not properly compensated." *Melendez v. Poy Loung DC Grp., LLC*, No. 17-cv-370, 2018 WL 4637007, at *6 (D.D.C. Sep. 27, 2018) (quoting *Arias v. U.S. Serv. Indus., Inc.*, 80 F.3d 509, 511 (D.C. Cir. 1996)); *see also Sanchez v. Sundely LLC*, 322 A.3d 529, 537 (D.C. 2024) ("[E]mployees typically bear the burden of showing that they worked without compensation" under the FLSA, DCWPCL, and DCMWRA.). The Defendants argue that Mr. Greer cannot carry that burden. The Court disagrees.

Where an "employer's time records are inaccurate or incomplete," a plaintiff may prove that he performed work for which he was not compensated by "produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 52 (D.D.C. 2006) (alteration in original) (quoting *Anderson,* 328 U.S. at 687). "The fact that the employee's evidence is merely an approximation is not a bar to recovery." *Id.* at 53. And inferences supporting an employee's alleged damages may be drawn from "oral testimony, sworn declarations, and whatever relevant documentary evidence the plaintiff provides" so long as those inferences are "consistent with the evidence in the record." *Serrano v. Chicken-Out Inc.*, 209 F. Supp. 3d 179, app. 187 (D.D.C. 2016) (report and recommendation); *id.* at 184–85 (adopting the magistrate judge's report and recommendation).

13

Here, Mr. Greer has produced sufficient evidence supporting that he performed uncompensated work from which a jury could draw "just and reasonable inference[s]" about the "amount and extent of that work." *Hunter*, 453 F. Supp. 2d at 52–53 (quoting *Anderson*, 328 U.S. at 687). As already discussed, Mr. Greer attests that he did not document overtime work in his timesheets—or in the invoices submitted by ACI to Viva—because the Defendants made clear that overtime would not be approved. *See* ECF No. 20-6 at 82; ECF No. 20-5 at 154; ECF No. 25-5 ¶ 8. And he points to two primary forms of evidence supporting that he worked hours for which he was not compensated.

First, he points to his own sworn testimony and contemporaneous records. He states that he "often worked more than 40 hours per week," and that Mr. Livengood required that of him by assigning work "during end-of-day workday meetings . . . due at the beginning or during the following workday." ECF No. 25-5 ¶¶ 8, 10; *see also* ECF No. 20-6 at 85 ("Toward the end I would be up all night long sometimes doing IBM work . . . particularly . . . from 2021 onwards, I was staying up to 2:00, 3:00, 4:00 in the morning."). Mr. Greer contemporaneously documented many of Mr. Livengood's demands and the overtime hours that they required him to work during his final months on the job. *See, e.g.*, ECF No. 25-9 at 17–18, 21–24, 27–36. And he says that he communicated with IBM and Viva personnel that he was working well beyond regular hours. *See* ECF No. 20-5 at 154 (recounting that he told a Viva representative "I'm working 80 hours a week, okay, and this is crazy" to which the representative responded, "If you want the job, just do it"); *see also* ECF No. 25-10 at 3 (email to Ms. Lipe-Dobson saying "I've put in 50 hours some weeks only getting paid 32 sometimes and I never said a word").

Second, Mr. Greer points to records showing that he often logged into the EPA's virtual private network (VPN) for more than 40 hours each workweek. PSOF ¶ 18. Mr. Greer obtained these records by submitting a Freedom of Information Act request to the EPA. ECF No. 25-5 ¶ 12.

14

He then retained a consultant, Meredith Carpenter, to analyze that data. *Id.* ¶ 13. In reviewing the VPN log file and Mr. Greer's invoices between June 2019 and July 2021, Ms. Carpenter determined that there were 70 weeks in which Mr. Greer "spent time outside of business hours"— *i.e.*, outside of 9 a.m. to 5 p.m. Monday through Friday—"logged into the VPN connection." ECF No. 25-7 at 3. For 62 of those weeks, "Mr. Greer's invoiced hours plus his hours logged into the VPN connection outside of business hours were greater than 40 hours." *Id.* For fourteen of the weeks, "Mr. Greer invoiced less than 40 hours but he had additional hours logged into the VPN connection outside of business hours." *Id.*[4] Looking at these weeks more closely, Ms. Carpenter calculated that Mr. Greer worked approximately 988 total hours of uncompensated time going back to June 2019. *Id.* at 3–4. She says that she arrived at this number using a "conservative methodology" that likely "underestimat[ed] the hours that Mr. Greer could have been working." ECF No. 25-8 at 2. She did not, for example, include in her calculation "any VPN hours where the connection was made during the regular workday and was not disconnected until hours later, after the end of the regular workday." *Id.*

In response to Ms. Carpenter's report, the Defendants retained their own expert, David Sun, who takes issue with Ms. Carpenter's calculations and more broadly asserts that "an open VPN connection is not a reliable sole indicator of when a user is performing work functions." ECF No. 20-9 at 6. That may be true. But again, Mr. Greer is not relying *solely* on his VPN records for proof that he worked overtime.[5] His sworn testimony and other contemporaneous records, if

---

[4] The Court understands these weeks to have had fewer than 40 normal business hours because of holidays. *See* ECF No. 20-5 at 103.

[5] For this reason, *Harvill v. Westward Communications*, *L.L.C.*, 433 F.3d 428 (5th Cir. 2005), on which the Defendants rely, is inapposite. There, the plaintiff "offered no factual allegations *at all* to substantiate her claim, and . . . presented *no* evidence of the amount or the extent of hours she worked without compensation." *Id.* at 441.

credited, can support "just and reasonable inference[s]" about when and how often he was working after hours. *Hunter*, 453 F. Supp. 2d at 52 (quoting *Anderson,* 328 U.S. at 687). Mr. Greer's testimony also suggests that his VPN records may in fact be a strong indicator of when he was working. He stated at his deposition that he understood it to be "illegal" to be on the VPN and not working. ECF No. 25-4 at 14. While he conceded that he may have left his laptop connected to the VPN for brief periods when he got up to go to the bathroom, he affirmed that those instances were rare as he was "pretty good about that kind of thing." *Id.* at 13–15.

At bottom, a jury might discredit Mr. Greer's sworn testimony and his contemporaneous records about his hours. And it may find the Defendants' expert more persuasive. But the Court may not make those determinations at summary judgment. Viewing the record in the light most favorable to Mr. Greer, a jury could conclude "that he performed work for which he was not properly compensated." *Melendez*, 2018 WL 4637007, at *6 (quoting *Arias*, 80 F.3d at 511).

### c. Defendants' Knowledge of Uncompensated Work

To sustain his unpaid wage claims, Mr. Greer also must come forward with evidence that the Defendants "knew or had reason to believe" that he worked the hours for which he was not compensated. *Akinsinde v. Not-For-Profit Hosp. Corp.*, No. 16-cv-437, 2018 WL 6251348, at *7 (D.D.C. Nov. 29, 2018) (cleaned up) (quoting 29 C.F.R. § 785.11); *see also Hunter*, 453 F. Supp. 2d at 53 (D.D.C. 2006) (stating that "a plaintiff in an FLSA overtime action also must demonstrate . . . that the employer had knowledge, or should have had knowledge, of the overtime"). He can do this by showing that the Defendants "either had actual knowledge of the overtime hours worked or, through the exercise of reasonable diligence, could have learned of such work." *Akinsinde*, 2018 WL 6251348, at *7. The Defendants argue that Mr. Greer has not met this burden. The Court again disagrees.

16

Mr. Greer has produced evidence supporting that both Viva and IBM were aware that he was regularly working outside of business hours. He testified that he told his Viva point of contact that he was "working 80 hours a week" and was told that if he wanted the job, to "just do it." ECF No. 25-3 at 20; *see also* ECF No. 20-6 at 83 (Mr. Greer testifying that he had "[t]elephone conversations with Chandru Bala of Viva" in 2021 during which he informed Mr. Bala that he had been and was at that point "working fantastic amounts of overtime"). Mr. Greer similarly emailed Ms. Lipe-Dodson at IBM in February 2021 and told her that Mr. Livengood had "been on [him] countless times" since taking over as Program Manager and that he had "put in 50 hours some weeks only getting paid 32." ECF No. 25-10 at 3. Perhaps most importantly, Mr. Greer has testified that there was no way Mr. Livengood could have been unaware of his overtime work because Mr. Livengood routinely assigned him work "during end-of-day workday meetings" that was "due at the beginning or during the following workday, making it impossible to complete the work during regular workday hours." ECF No. 25-5 ¶ 10.

On this record, a jury could reasonably conclude that IBM and Viva were aware that Mr. Greer was working overtime. Again, Mr. Greer's evidence is far from airtight and much will hinge on whether a jury believes his version of events. That type of "credibility determination," however, is exactly the sort of determination "that the Court cannot make at this stage of the litigation." *Hunter*, 453 F. Supp. 2d at 53; *see also Akinsinde*, 2018 WL 6251348, at *7 ("Whether an employer possessed the requisite knowledge is a question of fact."). Thus, the Court may not enter summary judgment on this basis. *See Hunter*, 453 F. Supp. 2d at 53 (declining to enter summary judgment where the plaintiff admitted not reporting the hours he worked in the defendant's time entry system but testified "that his supervisors knew he was regularly working through lunch and staying late—often until 'most of them were gone'").

17

## 2. Proof of Damages

Next up is the Defendants' argument that Mr. Greer "cannot prove damages against IBM or Viva because Viva paid all monies to cover the alleged unpaid hours that [Mr. Greer] claims he worked." Mem. Summ. J. 20. The Court is unconvinced.

Unpacking the Defendants' argument, it hinges on two key premises: (1) that Viva has paid ACI for all invoices that ACI submitted under their Subcontractor Agreement (excluding the final invoice submitted in August 2021); and (2) that while the Subcontractor Agreement sets a rate at which Viva must pay ACI (*i.e.*, approximately $49 per hour), there is nothing establishing the rate at which ACI must pay Mr. Greer. *See id.* Accepting these as true, the Defendants' argument goes like this. Mr. Greer is only entitled to the minimum wage and overtime rates prescribed by the DCMWRA, which were approximately $15 and $22, respectively, during the final months of his employment. *Id.* at 20–21; DSOF ¶¶ 99–100. Applying those rates, the total value of *all* Mr. Greer's hours—"both invoiced and alleged"—is $82,712.25, which is substantially less than the $198,576.00 that Viva has already paid to ACI. Mem. Summ. J. 20–21. Thus, any underpayment of Mr. Greer is attributable to ACI. *Id.* at 20–21. After all, ACI had the power to set Mr. Greer's pay rate and chose to pay him less than what it was receiving from Viva as compensation for his services. *Id.* at 21.

This argument is a reach. Determining the exact nature—or at least the economic reality—of Mr. Greer's employment relationship with ACI, Viva, and IBM is a fact-intensive inquiry that must be left to the jury. And until that inquiry is conducted, the Court cannot find as a matter of law that Mr. Greer was not entitled to the hourly pay rate negotiated between ACI and Viva rather than the DCMWRA rates asserted by the Defendants. If Mr. Greer proves that he is entitled to the

18

former rate, that IBM and Viva were his employers, and that he worked hours for them for which he was not paid, then he also may prove that he can recover damages against them.[6]

### 3.    Unclean Hands

Finally, the Defendants argue that the unclean hands doctrine bars Mr. Greer's claims because he failed to report or invoice any overtime hours. This argument, too, comes up short.

"Generally speaking, the unclean hands doctrine requires that a party seeking equitable relief show that his or her conduct has been fair, equitable, and honest as to the particular controversy in issue." *Bartko v. SEC*, 845 F.3d 1217, 1227 (D.C. Cir. 2017) (cleaned up). The party asserting the doctrine bears the burden of showing that it applies. *See Saint-Jean v. D.C.*, 846 F. Supp. 2d 247, 258 (D.D.C. 2012). And that burden is satisfied "by a showing of truly unconscionable and brazen behavior." *Id.* (cleaned up); *see also Cochran v. Burdick,* 89 F.2d 831, 834 (D.C. Cir. 1937) ("Equity will refuse relief to a suitor who approaches with unclean hands, whether it is due to conduct which technically constitutes fraud, or which is unconscionable.").

The Defendants have not carried that burden here. They argue that Mr. Greer's hands are "unclean" because he "failed to report hours he now claims he worked, directed ACI to do the same, and directed he be underpaid for hours he *did* report." Mem. Summ. J. 5–6. But as already

---

[6] In support of this argument, the Defendants also assert that Mr. Greer and ACI are "essentially one and the same" since he is ACI's sole owner, operator, and employee. Mem. Summ. J. 20, ECF No. 20-1. It is not clear how that assertion supports their argument regarding damages. Indeed, by emphasizing that Mr. Greer and ACI are indistinguishable and arguing, at the same time, that Mr. Greer chose (on behalf of ACI) to underpay himself, the Defendants highlight the potential pitfalls of their prior arguments about the economic reality of their employment relationship with Mr. Greer. As discussed, Mr. Greer has produced evidence supporting that the contractual relationship between ACI and Viva did not reflect the "economic reality" of his relationship with the Defendants. He contends that ACI did not operate as a meaningfully distinct entity that *employed* him but rather a corporate alter ego that stood directly in his shoes for logistical and tax purposes. While a jury ultimately may not adopt that view, it starts to look increasingly plausible when placed side by side with the Defendants' somewhat strained depiction of ACI as both Mr. Greer's solely controlled personal corporation and the "direct employer" that was exploiting his labor. *See* Mem. Summ. J. 21.

discussed, Mr. Greer has produced evidence supporting that he did not report overtime hours because he was discouraged from doing so, and that his "directions" to ACI are irrelevant because the Defendants, not ACI, were his employers for purposes of his unpaid wage claims. If a jury credits Mr. Greer's version of events, he would not have engaged in any misconduct, much less conduct that is "truly unconscionable and brazen." *Saint-Jean*, 846 F. Supp. 2d at 258 (citation omitted). So the Court may not grant summary judgment on this basis.

*       *       *

For the above reasons, the Court declines to enter summary judgment for the Defendants on Mr. Greer's claims.[7]

### B.       IBM and Viva's Claims Against ACI

IBM and Viva advance claims against ACI for breach of contract, contractual indemnification, and statutory indemnification under the DCMWRA and DCWPL. These are all contingent claims that have not yet accrued, so summary judgment is inappropriate.

### 1.       Breach of Contract and Contractual Indemnification

"To prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Shaffer v. George Washington Univ.*, 27 F.4th 754, 762 (D.C. Cir. 2022) (cleaned up); *see also Weatherly v. Second Nw. Coop. Homes Ass'n*, 304 A.3d 590, 595 (D.C. 2023) (same).

---

[7] In his Opposition, Mr. Greer seeks to reopen an earlier decision of the D.C. Superior Court precluding him from bringing DCMWRA claims for overtime allegedly worked from March 15, 2020, to July 31, 2021. Opp'n Mot. Summ. J. 30–34, ECF No. 25. This argument faces several obstacles, including the law of the case doctrine and res judicata. But the Court need not wade into those issues in the context of the Defendants' summary judgment motion, as Mr. Greer's request is procedurally improper. *See Hooker v. HHS*, 952 F. Supp. 2d 194, 203 n.9 (D.D.C. 2013) ("[A]n opposition to a motion for summary judgment is not the proper place to seek reconsideration" of earlier rulings.).

Here, the Defendants have not established breach. As they acknowledge, their ability to show that ACI breached its agreement with Viva by "fail[ing] to properly pay" Mr. Greer is contingent on the Court finding that Mr. Greer has in fact been underpaid. Mem. Summ. J. 23–24; Third-Party Compl. ¶ 50 ("In the event this Court finds Plaintiff Greer's allegations for unpaid wages or overtime are substantiated, ACI breached its agreement with Viva to pay its consultants for services rendered."). While the Court has declined to enter summary judgment against Mr. Greer on that point, neither has it entered summary judgment in his favor. And it is far from a forgone conclusion that Mr. Greer will convince a jury that he worked any hours for which he was not properly compensated. Until he prevails on that point, the Defendants cannot establish breach.

The same is true of the Defendants' claim for contractual indemnification. ACI can only be ordered to indemnify them if the Court finds that Mr. Greer is "entitled to some measure of damages." Mem. Summ. J. 25; Third-Party Complaint ¶¶ 55–63; *see also Casanova v. Marathon Corp.*, 256 F.R.D. 11, 14 (D.D.C. 2009) ("[A] claim for indemnification does not accrue until the party seeking indemnification is held liable and makes a payment."). The Court has made no such finding. Thus, the Defendants are not entitled to summary judgment.

### 2.     Statutory Indemnification

The Defendants' arguments regarding their statutory indemnification claims are similarly deficient. Even assuming, without deciding, that these claims are not tripped up by other factors,[8] they have not accrued. As the Defendants themselves note, before ACI can be made "to indemnify Viva and IBM as 'general contractors'" under the DCMWRA or DCWPCL, Mr. Greer must first "prevail[]" on at least one of his claims. Reply Mot. Summ. J. 26. In other words, IBM and Viva

---

[8] Mr. Greer argues, for example, that ACI cannot be "forced to pay [his] wages" or to indemnify IBM and Viva for their failure to do so because ACI is not Mr. Greer's employer under the D.C. wage laws. Pl.'s Opp'n Mot. Summ. J. 21. That duty, he says, falls to IBM and Viva as his actual employers and "cannot be conferred on ACI by contract." *Id.*

must be "found to be liable to [Mr.] Greer." Third-Party Compl. ¶¶ 68, 74. Such a finding has not been made.

Federal Rule of Civil Procedure 14 permits the Defendants to advance these contingent third-party claims. *See* Fed. R. Civ. P. 14(a)(1) ("A defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or *may be liable* to it for all or part of the claim against it." (emphasis added)); *see also Millers Cap. Ins., Co. v. Hydrofarm, Inc.*, 340 F.R.D. 198, 215–17, 217 n.10 (D.D.C. 2022) (explaining why contingent claims brought under Rule 14 do not run afoul of the Supreme Court's standing and ripeness doctrines). But until the contingencies on which those claims depend occur, the claims have not accrued and cannot be fully proven. They are thus unamenable to summary judgment.

\*    \*    \*

For these reasons, the Court may not enter summary judgment for IBM and Viva on their third-party claims against ACI.

### C.    Motion for Realignment

Up next is Mr. Greer and ACI's motion to realign ACI as a plaintiff in this case. Mr. Greer and ACI seek realignment on the basis that they are not adverse. But as the preceding analysis makes clear, the precise nature of Mr. Greer's relationship with ACI is a matter of factual and legal dispute, at least as to whether ACI is Mr. Greer's employer under the FLSA and D.C. wage laws. Under these circumstances, the Court concludes that realignment is inappropriate at this time. Mr. Greer and ACI may renew their request during pretrial proceedings and the Court will determine the most efficient way to present this case to the jury for resolution.[9]

---

[9] The Court notes that while realignment principles are "most commonly deployed when assessing whether diversity jurisdiction exists," *Lazarus v. Karizad, LLC*, No. 20-cv-1787, 2021 WL 765708, at \*7 (D.D.C. Feb. 26, 2021), courts have concluded that they apply "regardless of the basis for federal jurisdiction," *Larios v. Perdue*, 306 F. Supp. 2d 1190, 1195 (N.D. Ga. 2003) (first

### D.    Motion to Exclude

Finally, the Court turns to Mr. Greer's motion to exclude the testimony and report of the Defendants' expert, David Sun. "Courts must proceed cautiously when deciding whether to exclude expert testimony at the summary judgment stage." *Simmons v. Textron, Inc.*, No. 21-cv-1077, 2025 WL 901170, at *7 (D.D.C. Mar. 24, 2025) (cleaned up). This is "[b]ecause the summary judgment process does not conform well to the discipline that *Daubert* [*v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)] imposes," *Simmons*, 2025 WL 901170, at *7 (quoting *Cortes-Irizarry v. Corporacion Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997)), and also because the Court's "gatekeeper[] . . . role is significantly diminished at the summary judgment stage" when there is no danger of a jury being exposed to unreliable evidence, *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, No. 13-cv-1215, 2016 WL 7839128, at *1 (D.D.C. Sep. 21, 2016) (cleaned up). Accordingly, "the decision whether to conduct the reliability and helpfulness analysis that *Daubert* and Rule 702 require" at the summary judgment stage is "within the discretion of the court." *Boesen v. Brown*, No. 19-cv-3499, 2023 WL 7552688, at *4 (D.D.C. Nov. 14, 2023) (cleaned up). The Court declines to conduct a *Daubert* and Rule 702 analysis of Mr. Sun's report now. It will instead deny Mr. Greer's motion without prejudice to him renewing it when the Court sets pretrial deadlines.[10]

---

citing *Dev. Fin. Corp. v. Alpha Hous. & Health Care, Inc.,* 54 F.3d 156, 159 (3d Cir. 1995); and then citing *Wade v. Miss. Co-op. Extension Serv.,* 528 F.2d 508, 521–22 (5th Cir. 1976)).

[10] The Defendants have also stated their intent to seek exclusion of the report and testimony of Mr. Greer's expert, Ms. Carpenter. Opp'n Mot. Exclude 4 n.1, ECF No. 21. Before either Party moves to exclude, however, the Court notes that its initial impression is that both experts appear likely to satisfy the generally "liberal and flexible" standard imposed by Rule 702. *See Inova Health Care Servs., for Inova Fairfax Hosp. v. Omni Shoreham Corp.*, No. 20-cv-784, 2024 WL 4534156, at *2 (D.D.C. July 16, 2024) (cleaned up). Both Ms. Carpenter and Mr. Sun appear to have relevant specialized knowledge and at least portions of their testimony appear likely to help the jury understand the evidence. With that in mind, the Court encourages the Parties to work together to resolve their objections to the proposed expert testimony.

**CONCLUSION**

For all these reasons, the Court denies the Defendants' Motion for Summary Judgment, ECF No. 20, and denies without prejudice Mr. Greer and ACI's Motion to Realign ACI as a Plaintiff, ECF No. 24, and Mr. Greer's Motion to Exclude the Report and Testimony of David Sun, ECF No. 19.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   July 29, 2026

24